**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:23 C 04686** |
| | ) | |
| **DOUG COLLINS, Secretary, United States** | ) | **Judge Rebecca R. Pallmeyer** |
| **Department of Veterans' Affairs,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

For nearly twenty years, Captain Thomas Johnson was a police officer at the Edward Hines, Jr., U.S. Department of Veterans Affairs ("VA") facility in suburban Chicago. Johnson has long complained of discrimination at the Hines facility; he previously brought two federal lawsuits, both of which were settled, and has filed several internal complaints charging his supervisors with discrimination and retaliation. In this lawsuit, Captain Johnson alleges that VA officials (1) retaliated against him for prior lawsuits and complaints, and (2) discriminated against him because of his age. Specifically, he claims his supervisors denied him a promotion, "micromanaged" him, and orchestrated a false sexual harassment allegation against him for retaliatory and discriminatory reasons. These actions, according to Johnson, led him to retire early in 2023. He brings retaliation, discrimination, and constructive discharge claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*.

The VA has moved for summary judgment [40]. As explained below, Johnson's age-discrimination claim is not exhausted, and he has not presented evidence sufficient to support a finding that any of the mistreatment he has alleged was the product of retaliation. Nor does the

evidence support his constructive discharge claim. The court therefore grants Defendant's motion on each of Plaintiff's claims and enters judgment in this case.

## BACKGROUND

The facts are set forth in the parties' respective Local Rule 56.1 statements. (*See* Def. LR 56.1 SOF ("DSOF") [43]; Pl. LR 56.1(b)(3)(C) SOF ("PSOF") [51].) At summary judgment, the court construes the evidence in the light most favorable to Johnson, the non-moving party. *See Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). Johnson's allegations of discrimination and retaliation were reported in two separate EEO complaints: one filed in December 2021, and another filed in April 2022. The court first recounts the factual background of this case, and then summarizes the allegations included in each EEO charge.

### I.  Factual Background

The events giving rise to this lawsuit occurred at the Edward Hines, Jr., U.S. Department of Veterans Affairs facility in suburban Chicago. The Hines facility consists of a sprawling main campus in Hines, Illinois, and six satellite facilities, known as community-based outpatient clinics ("CBOCs"), located in six surrounding Illinois communities: Joliet, Oak Lawn, Manteno ("Kankakee County"), Aurora, LaSalle, and Elgin. (DSOF ¶ 3.)

Plaintiff Thomas Johnson, an African American man, was born in 1948. (*Id.* ¶ 1.) From 2002 until his retirement in 2022, Captain Johnson was employed as a police officer in the in-house police force at the Hines VA facility. (*Id.*) Johnson has had a number of disputes with the VA during his tenure, including two federal lawsuits prior to this one. The first case was filed in 2008, settled in 2011, and is of no relevance here. (*Id.* ¶ 7); *see Johnson v. Peake*, No. 08 C 1903 (N.D. Ill.). The second was filed in 2015; in it, Johnson alleged that the VA discriminated and retaliated against him when he was not selected for two promotional opportunities. (DSOF ¶ 8); *see Johnson v. McDonald*, 15 C 11092 (N.D. Ill.). After several of Johnson's claims in that

case survived summary judgment, Johnson and the VA settled on June 25, 2021.[1]  (DSOF ¶ 8.)
In the settlement agreement, Johnson agreed to release "any and all claims, demands, and
causes of action of every kind, nature, or description, whether known or unknown, that plaintiff
may have had, may now have, or may hereafter discover arising out of or in connection with any
event occurring prior to" June 25, 2021.  (DSOF ¶ 8; *see also* Pl. Resp. to DSOF [50] ¶ 8.)

In August 2020, while that lawsuit was pending, Johnson applied for, and received, a
promotion to the position of "physical security specialist" at the Hines facility.  (Pl. Resp. to DSOF
¶ 5.)  When Johnson initially applied for the job, there was only one such position available; but
after he was selected for the promotion, the VA created a second position and promoted his
coworker, William Armstrong (a white man in his 50s), to work in that second position.  (Pl. Resp.
to DSOF ¶¶ 5–6; Pl. Decl. [51-3] ¶ 5; *see also* PSOF ¶ 27(2) (describing Armstrong).)  Johnson
and Armstrong shared duties: Johnson was responsible for security at the six satellite CBOCs,
while Armstrong worked at the central Hines campus.  (DSOF ¶¶ 5–6.)  Both were supervised
directly by Major Deshaun McField, and indirectly by Chief Kimberly Coleman, who led the Hines
VA police force.  (Pl. Resp. to DSOF ¶ 4.)

Johnson soon became frustrated with his new role: because he was responsible for CBOC
security, his position required substantial travel between each of the facilities.  He viewed
Armstrong's assignment as preferable, and believed that Armstrong was given that more
attractive assignment because Armstrong is white, younger, and had no history of protected
activity.  (PSOF ¶ 27(2).)  On October 28, 2021 (after entering into the settlement of the case he
had filed in 2015), Johnson emailed several VA officials, including Chief Coleman and Major
McField, to "complain about disparate treatment and reprisal for his prior litigation against the

---

[1]    It is undisputed that the parties' settlement agreement was effective June 25, 2021
(DSOF ¶ 8 (uncontested)), but the court notes that a stipulation to dismiss the case was not filed
until November 19, 2021.  (*See* Stipulation to Dismiss [93], in *Johnson v. McDonald*, 15 C 11092
(N.D. Ill.)).

Agency and other opposition to discriminatory conduct." (PSOF ¶ 8.) Specifically, the email complains that Johnson had been treated differently than Armstrong, who Johnson characterizes as "a younger, White officer, without any protected activity." (Pl. Ex. 4 [51-4].) Johnson suggests that the VA's decision to hire Armstrong—which appears to have occurred well prior to the settlement of Johnson's 2015 case—was itself discriminatory: he notes that the VA did not create the position Armstrong filled until Johnson himself was hired for the role; that Armstrong had previously been "sued for harming a VA employee"; and that Armstrong was unfairly given the more favorable assignment at the central campus. (*Id.*) He further claims that he was "subjected to heightened scrutiny and held to a different standard than Armstrong"; that Armstrong was given an assistant, while he was not; and that Armstrong was given an office on the Hines campus, while Johnson's office was at the Joliet CBOC. (*Id.*; *see also* Pl. Decl. [51-3] ¶ 6.) Captain Johnson ended the email by informing the VA that he was "considering all legal options in response to the discrimination and reprisal," and requested that he "be treated fairly from this moment forward." (Pl. Ex. 4 [51-4].) In this new lawsuit, Johnson alleges that he was in fact not treated fairly, but instead has been subjected to multiple instances of retaliation and age-based discrimination at the hands of Chief Coleman and Major McField.

### A. Chief Coleman

The crux of Johnson's case is Chief Coleman's failure to promote him on two occasions: in November 2021, and February 2022.

The first instance relates to Johnson's application for a "Police Investigator" position. The VA posted the open position in July 2021, and five candidates (including Johnson) were selected for an interview. (DSOF ¶ 9; Def. Ex. 13, Job Announcement [43-3] at 2.) While Coleman was ostensibly the hiring officer, her role in the process was minimal—the interviews were conducted by an outside panel of three officials from other VA facilities. (DSOF ¶¶ 10–13.) The interviews were conducted by telephone on November 1, 2021, and the five interviewees were assessed based on four objective criteria (qualifications, knowledge, skills, and abilities), as well as their

4

responses to the same five performance-based questions.  (DSOF ¶¶ 14–15.)  It is undisputed that Johnson received the lowest score of the five applicants, and that Timothy Abner (who is white, and whose age is not stated in the record) scored the highest.  (DSOF ¶ 16, Pl. Resp. to DSOF ¶ 16.)  Coleman selected Abner for the position.  The VA asserts that Abner's high scores were a product, in part, of Abner's "tenure as a law enforcement officer (almost eight years more than Johnson) and his many more years of supervisory experience."  (DSOF ¶ 17.)  Johnson disputes this rationale, asserting that the Police Investigator position was not supervisory and that supervisory experience is therefore not necessary for the position.  (Pl. Resp. to DSOF ¶ 17.)  He also notes that Coleman has, in the past, promoted individuals who were "not at the top of 'the list.'"  (*Id.* ¶ 11.)

On December 22, 2021, Captain Johnson filed an EEO complaint, alleging, *inter alia*, that Coleman did not select him because of his age, race, and past protected activity.[2]  He states that a "[l]ess qualified individual without protected characteristics or activity"—presumably Abner—was selected.  (Def. Ex. 49, Dec. 2022 EEO Complaint [43-6] at 37.)

Second, Johnson alleges that Coleman refused to promote him to a GS-10 supervisory police position for which he applied in February 2022, in response to a VA vacancy announcement.  (DSOF ¶ 20; PSOF ¶ 27(3).)   Johnson was the only candidate who appeared on the "certificate of eligible candidates," but the VA did not hire him—or anyone—and the post went unfilled.  (*Id.*; DSOF ¶ 23)  The VA claims that no candidate was selected because Chief Coleman realized that "staffing levels prevented her from assigning the additional officers to the CBOCs who would have been supervised by the selectee for the promotion."  (DSOF ¶ 23; *see also* Def. Ex. 29, Coleman Aff. [43-4] at 10–11.)  Johnson disputes this explanation; he reasons that her explanation must be false because "[v]acancy announcements are only made after the staffing need has been shown by the service," and because Coleman later promoted Armstrong

---

[2]    Johnson's two EEO complaints are explained in more detail later in this opinion. *See infra* at 11–12.

to GS-10 in May 2022. (PSOF ¶ 30.) But he cites no evidence for this other than his own speculation (Pl. Decl. [51-3] ¶ 21), and it is not clear that Armstrong's promotion means that VA's explanation was a lie. Armstrong was assigned to the central Hines facility, where a supervisory police officer might have been necessary even if one was not necessary at the CBOCs. Notably, Johnson's attorney never asked Coleman about the GS-10 promotion during her deposition. (DSOF ¶ 23.) But he filed a second EEO complaint on April 21, 2022, alleging that Coleman denied him the promotion for retaliatory and discriminatory reasons. (*Id.* ¶ 65.)

### B.  Major McField

Johnson also claims that McField, his direct supervisor, discriminated and retaliated against him throughout 2021 and 2022. (PSOF ¶¶ 8; 27) Johnson does not say explicitly which of his protected actions gave rise to McField's alleged retaliation, but he suggests that it was due to some combination of (1) Johnson's testimony during an internal investigation, (2) Johnson's assistance to a coworker who had accused McField of sexual harassment, and (3) an EEO complaint in which Johnson accused McField of favoring Armstrong over Johnson. (PSOF ¶¶ 8, 9–13; 27.) The court examines these episodes in more detail below.

First, in December 2020 to January 2021, Johnson claims he testified in an investigation "conducted by Kathy A. Treadwell, Anthony Gallagher, and Martin Runge, which investigated complaints about McField's conduct with women and harassment/retaliation by police management." (PSOF ¶ 8.) Johnson cites to no evidence that describes this investigation, however, other than his own Declaration (Pl. Decl. [51-3] ¶ 2), and a section of his deposition in which he briefly describes an investigation involving "Treadwell, which is a chief, along with two other chiefs." (Def. Ex. 1, Pl. Dep. [43-2] at 42:1–42:12.) In the disposition testimony, Johnson testified that he provided testimony to investigators, and claimed that investigators concluded that police department supervisors engaged in misconduct. He testified:

> Before they came in, Treadwell, which is a chief, along with two other chiefs came, and I actually had to sit in as a witness for Sergeant John Paoli, but they came back and said, yes, Chief Coleman [and] McFields . . . they were all just

6

misappropriating policies and everything. They were showing disparity in treatment. They discriminated against certain officers. That was their finding . . . Me being of them certain officers.

(*Id.*)[3]

Second, in early-to-mid 2021, Johnson claims to have assisted a coworker, Veronica Ross-Clay, in reporting McField for sexual harassment. (PSOF ¶¶ 9–13.) On March 29, 2021, Ms. Ross-Clay resigned from the VA; she later wrote a letter ("the Ross-Clay Letter") in which she alleged that she had resigned because McField had sexually harassed her.[4] (*Id.* ¶ 9; *see also* Ross-Clay Letter [51-5].) Ross-Clay did not address the letter to any individual or group, but stated that it was intended "to uncover the truth behind my resignation." (Ross-Clay Letter [51-5] at 2.) At some point (it is not clear when), Ross-Clay shared the letter with Johnson, who then shared it with fellow officer John Paoli. (PSOF ¶ 12; Def. Ex. 1, Pl. Dep. [43-2] at 46 (speculating that Ross-Clay shared the letter with Johnson "a month or maybe two" after her resignation).)

In his LR 56.1 statement, Plaintiff asserts that he and Paoli "complained about McField's conduct internally" and then "shared the letter with VA administrators" outside of the Hines facility.[5] (PSOF ¶ 12.) But the VA objects to this characterization, noting that it was *Paoli*—not Johnson—who forwarded the letter to investigators, as both Paoli and Johnson himself acknowledged in their deposition testimony. (*See* Def. Ex. 1, Pl. Dep. [43-2] at 42:15–17 ("I did

---

[3]    Johnson's statements about what investigators concluded are hearsay, and thus cannot be considered for the truth of what they assert. *See* FED. R. EVID. 801. The court will consider Johnson's testimony only for the limited purpose of establishing that he testified against McField during the Treadwell investigation.

[4]    Specifically, Ms. Ross-Clay alleged that McField approached her husband and inquired about his sexual activities with Ms. Ross-Clay; on a separate occasion, McField also made a sexually charged comment about her body at work. Ross-Clay also alleges that McField would inquire about her whereabouts, ask who she "was with while on lunch and breaks," would constantly summon her to his office, offered to take her to a shooting range for firearms lessons, and scrutinized her requests for leave. (*See* Ross-Clay Letter [51-5] at 1–5.)

[5]    Plaintiff's LR 56.1 statement references "PX 6, Clay Dep. Tr.," but no such transcript was filed. (PSOF ¶ 9.) There is a document on the docket that is labeled as "PX 6," but it does not include any content. (*See* Pl. Ex. 6 [51-6].)

pass the letter on to Sergeant Paoli, and he sent it to the secretary of the VA"); Def. Ex. 48, Paoli Dep. [43-6] at 38:10–41:4 (confirming this); *see also* Def. Resp. to PSOF [55] ¶ 12 (citing to extensive evidence showing that Paoli sparked the investigation into McField by reporting Ross-Clay's allegation).) Paoli testified that Johnson did not want to forward the letter because he "had a complaint against the VA at the time" and he did not want to be perceived as "doing something to get back at the VA." (Def. Ex. 48, Paoli Dep. [43-6] at 38:10–40:5.) While Johnson's LR 56.1 statement otherwise refers sporadically to his "reporting" of McField's harassment, Johnson cites to no admissible evidence suggesting that he took any other actions at the time with respect to Ms. Ross-Clay's accusations.

The third alleged instance of protected activity was Johnson's December 2021 EEO charge—the same charge in which Johnson alleged that Coleman had retaliated against him by failing to hire him for the Police Investigator role. In addition to that claim, this charge alleged that McField treated Johnson less favorably than Armstrong because of "protected characteristics or activity." (Dec. 2021 EEO Complaint [43-6] at 37.) He does not elaborate in the charge itself, but in an affidavit submitted during the VA's subsequent investigation, Johnson complains of micromanagement, less favorable assignments, and being denied job perks that Armstrong enjoyed—the same allegations that he had made in his October 28, 2021, email to his supervisors. When asked to provide specific examples of less favorable treatment, he accuses McField of:

> Mico manage [sic] my work. No help/training, I had to drive Over 30 miles to an office in Joliet, IL. Before [former Deputy Chief Eric] Ousley die I was given the okay for an office upstairs in building 8. Office was taken . . . Co-worker received the opportunity to attend physical security schools. All overtime from me required advance notice even if I got in stuck traffic traveling back from the CBOC's, my overtime wasn't allowed . . . I was not liked by management, because of my knowledge of their lack of integrity.

(Def. Ex. 8, Johnson EEO Aff. [43-2] at 211.)

In his Opposition and LR 56.1 filings, Johnson alleges that McField retaliated against him "following his protected activity"—but he does not identify the specific protected activity. (Opp'n

[52] at 13; PSOF ¶¶ 8, 27.) As best the court can determine, Johnson believes that McField took actions against him due to some combination of his EEO complaints, prior lawsuits, testimony to internal investigators, and internal reporting. (*E.g.,* Opp'n [52] at 12–14 (mentioning the EEO Charge as a cause of retaliation); PSOF ¶ 27 (same, with the "Clay situation")).) McField's alleged retaliatory acts took the form of (1) false disciplinary investigations; (2) requiring that Johnson request overtime in advance;[6] (3) constant calls and texts asking about his whereabouts; (4) denials of training opportunities; (5) berating him for "not producing reports before they were due"; and (5) other forms of micromanagement. (PSOF ¶¶ 27 (1)-(7).) He contends that McField did not subject Armstrong, his counterpart at the Hines campus, to the same level of scrutiny and oversight. (*Id.* ¶ 27(5).)

Johnson also alleges that McField orchestrated a false sexual harassment allegation against him in March 2022. (PSOF ¶ 27(8).) The accusation was made in an internal complaint filed by Brittney Stubblefield, a VA employee at the Kankakee County CBOC facility. (DSOF ¶ 33.) Stubblefield alleges that Johnson approached her on March 31, 2022, and inquired about her "guy friend." He then allegedly leaned in and suggested a scheme to provoke jealousy: Johnson would answer Stubblefield's phone and tell the friend that Stubblefield was "busy" while she made "moaning and groaning" noises in the background.[7] (Def. Ex. 36, Stubblefield Statement [43-5] at 9–10.) Stubblefield reported this remark, and her narrative was partially corroborated by her colleague Jacinta Jackson, who stated that she observed the encounter but did not hear what was said. (Def. Ex. 36, Jackson Statement [43-5] at 7.) An April 1, 2022, statement given by Dominique Uzdzinski—the supervisor of both Stubblefield and Jackson—

---

[6]     Because Johnson's job required him to travel between CBOC facilities, he "regularly encountered significant traffic requiring overtime." (PSOF ¶ 27(4).) McField required Johnson to request this overtime in advance. (*Id.*) Johnson believes this request was unreasonable, because "there was no way for [him] to know how much overtime he would need beforehand." (*Id.*)

[7]     Stubblefield also claimed that Johnson had repeatedly called her a "bad girl." (Stubblefield Statement [43-5] at 9.)

notes that both employees contemporaneously complained of inappropriate conduct by Mr. Johnson. He noted "this is not the first time I encountered Capt Johnson overstepping boundaries. I have asked Capt Johnson in the past to please stop interfering with [staff] duties with distractions . . . ." (Def. Ex. 36, Uzdzinski Statement [43-5] at 32.)

Johnson acknowledges that Stubblefield filed a complaint, but he contends that it was false. He suggests that McField convinced Stubblefield to fabricate the accusation against him. But it is not clear why he believes that McField is involved; Johnson asserts that Stubblefield is "McField's friend," but offers no evidence to support this. (Pl. Resp. to DSOF ¶ 33.) He also suggests that McField was involved in convincing a "different friend" to falsely report Paoli of sexual harassment, but, again, cites no evidence in support. (*Id.*)

After Stubblefield complained, Chief Christopher Wirtjes of the VA Patient Administrative Service ("PAS") department opened an internal investigation. (DSOF ¶ 35; Pl. Resp. to DSOF ¶¶ 35, 36, 37.) Because PAS staff generally do not interview police officers (Wirtjes Dep. [43-5] at 37), the investigation was "passed off to the VA Police." (DSOF ¶ 35 (undisputed).) According to Defendant, McField attempted to contact Johnson "multiple times over the course of the summer of 2022" (DSOF ¶ 36.), but Johnson never agreed to be interviewed. An internal memorandum confirms this; it details McField's efforts to schedule an interview with Johnson, and notes that the interview "never materialized due to scheduling conflicts, lawyer conflicts, etc." (Def. Ex. 36 [43-5] at 2.) In response, Johnson claims that McField did several fact-finding interviews in the summer of 2022 (evidently on other matters), but "McField never asked Plaintiff about Ms. Stubblefield's complaints" during these interviews. (Pl. Resp. to DSOF ¶ 36.)

In August 2022, with the investigation still ongoing, Captain Johnson retired. He claims that he did not wish to retire, but saw no other choice; he believes the "constant harassment, the investigations, and the failures to promote" demonstrated that his "supervisors were looking for an excuse to terminate him." (PSOF ¶ 31.) Following Johnson's retirement, McField ended the harassment investigation; he concluded that the allegations of harassment by Johnson were

substantiated and constituted a violation of the "Hines VA Code of Conduct." (Def. Ex. 36 [43-5] at 5–6.)

### C. VA's Internal Investigation

In May 2022, just prior to Johnson's retirement, Sergeant Paoli "reported numerous concerns regarding the operation and management of the Police Service."[8] (OSSO Memo. [51-14] at 3.) In response, the VA's Office of the Senior Security Officer ("OSSO") opened an internal investigation. The investigative team conducted numerous interviews and, on October 7, 2022, produced a memorandum (the "OSSO Memorandum") that summarized its results. The OSSO Memorandum does not describe Paoli's complaints in detail, but does note that his accusations "covered a relatively large span of time and categories of reported wrongdoing," and speculates that some "would be considered possible criminal offenses." (*Id.* at 3–4.)

Based on these interviews, investigators reached five factual conclusions. Most are of little relevance to this case—the investigation does not appear to have looked into any of Johnson's allegations of retaliation or discrimination, and Johnson himself is only mentioned in passing (in a paragraph recounting Ross-Clay's sexual harassment allegations). (*Id.* at 8.) Nor is there any mention that supervisors retaliated against subordinates for Title VII protected activity. The only finding relevant here is that subordinate officers, when interviewed, tended to depict McField and Coleman as vindictive, clique-y supervisors who held grudges and played favorites. The investigators wrote that Coleman and McField "administer policy, rules, and corrective action with disparity," and noted that "different standards are used, depending on the employee involved, and not the facts and impact of the situation." (*Id.* at 10.)

---

[8] Investigators also noted they considered accusations made in anonymous emails that made "veiled threats of media exposure if action was not taken." (OSSO Memo. [51-14] at 2.)

11

## II.     EEO Complaints and Procedural History

Johnson has filed two EEO Complaints relating to the facts of this case.  The first was filed

on December 22, 2021, and accuses Coleman and McFields of discrimination and reprisal (the

"December 2021 EEO Complaint").  (Def. Ex. 49, Dec. 2021 EEO Complaint [43-6] at 37.)  The

document states:

> Age/Race/Reprisal: Failure to promote: Less qualified individual without protected
> characteristics or activity selected.
>
> Harassment/HWE/Discrimination: Treated less favorably/more harshly/scrutinized
> more closely than co-workers without protected characteristics or activity.

(*Id.*)  In an affidavit in support of the Complaint, he "complained about his assignment to the

CBOCs and the denial of his request for an office at the Hines campus" and "complained about

his commute to the Joliet CBOC and that he was being micromanaged, denied the opportunity to

attend a training, and denied overtime."  (DSOF ¶ 63 (undisputed).)

Johnson filed a second EEO complaint on April 21, 2022 (the "April 2022 EEO Complaint").

A copy of this complaint is not in the record,[9] but both parties agree that the "accepted issues for

that complaint were (1) whether he had been subjected to a hostile work when his whereabouts

were scrutinized beginning in February 2022; (2) whether he was denied overtime beginning in

February 2022; and (3) whether he had been denied a promotion opportunity for discriminatory

or retaliatory reasons."  (*Id.* ¶ 65 (undisputed).)  Soon after the complaint was filed, however,

(while the investigation of the Stubblefield matter was ongoing), Johnson abandoned his

complaint.  He "did not respond to subsequent requests for information regarding the dismissed

claim nor did he provide any sworn testimony or evidence in support of his April 2022 EEO

---

[9]     The parties do not appear to have produced a copy of the April 2022 EEO Complaint.  The VA's LR 56.1 statement cites to "Ex. 27, April 2022 EEO Complaint," but that exhibit is a copy of the December 2021 EEO Complaint.  (*See* Def. Ex. 27 [43-4] at 1–2.)  The VA does submit a copy of the VA's "Notice of Partial Acceptance" of the Complaint, which describes its contents, and in any event the VA's description of the complaint is not disputed by Plaintiff. (*See* DSOF ¶ 65; Pl. Resp. to DSOF ¶ 65.)

complaint during the VA's administrative investigation." (DSOF ¶ 67.) The VA's final agency decision on his complaint describes the investigator's failed attempts to contact him:

> Complainant did not provide testimonial or documentary evidence despite being contacted by the investigator multiple times. The investigator contacted Complainant on August 15 and 17, 2022, providing interrogatories and asking Complainant to provide responses by August 29, 2022. When Complainant did not provide responses, the investigator contacted Complainant and his representative on September 6, 2022, and they did not respond. The investigator again contacted Complainant and his representative on September 12, 2022. On September 13, 2022, Complainant's representative stated he would 'discuss with his client' who 'had retired.' Neither Complainant nor his representative responded, and Complainant provided no testimony or evidence as of October 17, 2022.

(Final Agency Decision [43-4] at 27 n.4.)

Johnson filed this lawsuit [1] on July 19, 2023, alleging age discrimination, race discrimination, retaliation, and constructive discharge. (*See* Am. Compl. [15].) The VA moved for summary judgment [40] on May 19, 2025, asserting that Johnson has not put forward sufficient evidence that his supervisors' actions violated federal employment law. (*See* VA Br. [42].) In his response to the motion, Johnson withdrew his race discrimination claims. (Opp'n [52] at 1.) The motion is now fully briefed.

## **LEGAL STANDARD**

Summary judgment is appropriate "if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary judgment, "the district court must construe all facts and draw all reasonable inferences in favor of the non-movant." *Srail v. Village of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009).

Once a motion for summary judgment has been properly supported, the opposing party must produce affirmative evidence showing there is more than a "metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). An opposing party must produce affirmative evidence raising a genuine issue for trial; they may not rest upon allegations in the pleadings. *Anderson*, 477 U.S. at 256–57 (1986). Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

<u>**ANALYSIS**</u>

**I.     Retaliation**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to retaliate against an employee for engaging in protected activity. 42 U.S.C. § 2000e-3(a); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). To survive summary judgment on his retaliation claim, Johnson must offer sufficient evidence from which a jury could conclude that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there is a causal link between the two. *Est. of Harris v. City of Milwaukee*, 141 F.4th 858, 869 (7th Cir. 2025). Protected activity can include opposing any unlawful employment practice, as well as making a charge, testifying, or otherwise participating in an investigation into an unlawful employment practice. *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 274 (2009). An adverse action is one that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (citation and internal quotation marks omitted).

Johnson's brief in opposition to summary judgment focuses exclusively on the GS-10 denial as evidence of retaliation (Opp'n [52] at 10–12), but his LR 56.1 statements hint at other instances of alleged retaliation at the hands of McField. The court examines both in turn.

**A.  Coleman's Retaliation**

Johnson contends that Chief Coleman denied him the GS-10 promotion in February 2022 in retaliation for his having named her in the December 2021 EEO Complaint. The evidence does

not support this claim.[10]   The denial of a promotion is an adverse employment act, *Malin v. Hospira, Inc.*, 762 F.3d 552, 560 (7th Cir. 2014), but Johnson has presented no evidence of causation.

"To prevail on a Title VII retaliation claim, the plaintiff cannot merely show that she engaged in protected activity; she must also show that the defendants retaliated against her for that activity." *Giese*, 71 F.4th at 591.   Specifically, she must show but-for causation; that is, that "the adverse action would not have happened without the activity." *Johnson v. Accenture LLP*, 142 F.4th 536, 543 (7th Cir. 2025) (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014)).   To demonstrate but-for causation, a plaintiff can present direct evidence, but may also choose to rely on circumstantial evidence, which may include "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Gnutek v. Illinois Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (citation and internal quotation marks omitted).   Regardless of the type of evidence presented, the ultimate question is whether the plaintiff has presented sufficient evidence to create a triable issue of fact on causation.   *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Johnson's evidence does not pass muster.   His case primarily rests on the OSSO Memorandum's finding that Coleman administered "policy, rules, and corrective action with disparity" (Opp'n [52] at 11), but that document makes no mention of any of the allegations of retaliation that Johnson makes in this case, nor does it accuse Coleman of retaliating against any subordinate for Title VII activity.   Instead, Johnson appears to be offering the memorandum as

---

[10]      The VA argues that this claim was not exhausted because it was named in the April 2022 EEO Complaint that Johnson subsequently abandoned.   True, a failure to engage with internal investigators can constitute non-exhaustion, as explained below.   But, on the other hand, the Seventh Circuit has "long held that a plaintiff need not file a new charge alleging post-charge retaliation by the employer." *Ford v. Marion Cty. Sheriff's Off.*, 942 F.3d 839, 857 n.11 (7th Cir. 2019).   The court ultimately need not address this dispute, because it finds that summary judgment is warranted on other grounds.   Therefore, for the purposes of this motion, the court will assume, without deciding, that Johnson's retaliation claims are properly exhausted.

evidence that Coleman is a poor supervisor and a vindictive individual; but this amounts to character evidence, not admissible to establish that she acted in a vindictive manner with respect to his GS-10 promotion.  FED. R. EVID. 404(a); *see also* FED. R. CIV. P. 56(c)(2).  Johnson also points to "suspicious timing" between the December 2021 EEO complaint and the February 2022 denial of his promotion.  (Opp'n [52] at 11 (citing *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).) Suspicious timing can be evidence of retaliatory motive, but on its own it "is generally insufficient to establish a retaliatory motivation," *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 634 (7th Cir. 2022), and Johnson presents little else.

Defendant has presented a legitimate rationale for its failure to promote him:  the agency realized that it had no need for a GS-10 police officer in the first place.  (See VA Br. [42] at 18.) Johnson argues that this explanation is pretextual; he contends that agencies post job openings only when there is a demonstrated need, and notes that Armstrong was promoted to the role in May.  Johnson supports this contention with nothing more than his own speculation—specifically, his "belie[f]" that the position was reopened for Armstrong in May.  (Pl. Decl. [51-3] ¶ 21.)  But contentions "supported only by speculation or conjecture are not sufficient to survive summary judgment."  *Boardman v. Service Employees International Union*, 89 F.4th 596, 601 (7th Cir. 2023).  As Defendant observes, "Johnson has not offered any testimony or evidence to even suggest that he had first-person knowledge of the purported re-posting and promotion of Armstrong."  (Reply [56] at 9 n.9.)  Tellingly, when Coleman was deposed, Johnson's attorneys asked her no questions about the GS-10 promotion.  (*See generally* Pl. Ex. 6, Coleman Dep. [43-2].)  And again, if Armstrong was indeed promoted to GS-10, the VA's hiring of a GS-10 officer at the central campus in May is not inconsistent with a determination that it had no need for a GS-10 at the CBOCs three months earlier.

### B.    McField's Retaliation

Johnson's accusations against McField fare no better.  It is not even clear from Johnson's brief in opposition to summary judgment that Johnson intends to maintain this aspect of his

retaliation claim, as that brief focuses entirely on Coleman's—and not McField's—alleged retaliation. While the brief does discuss McField's activities, Johnson appears to invoke them only as evidence of Coleman's suspect motives, not as retaliation in their own right. (*See* Opp'n [52] at 11 (noting that McField's activity "support[s] an inference of retaliatory motive" on Coleman's part); *cf. id.* at 13 (suggesting that McField's actions contributed to Johnson's retaliatory constructive discharge).) To the extent he maintains that McField retaliated against him, he fails to clarify which protected activity triggered which adverse employment action.[11] Instead, he notes several instances of protected activity (including the Ross-Clay accusation and the December 2021 EEO Complaint), and several allegedly retaliatory acts (such as micromanagement, and the Stubblefield sexual harassment complaint) without establishing a link between them.

If Johnson is asserting a claim of retaliation regarding McField, that claim will not survive summary judgment. The bulk of Johnson's evidence focuses on his differential treatment vis-à-vis Mr. Armstrong, his coworker. Johnson and Armstrong had similar responsibilities, but Armstrong worked at the central Hines facility, whereas Johnson was expected to travel between the six satellite CBOC locations. Some elements of the alleged micromanagement, including frequent calls asking about his whereabouts and the disagreements about pre-approving travel-related overtime (*see* PSOF ¶¶ 27, 29), might be explained by the fact that Johnson's responsibilities required movement among several satellite locations. More importantly, however, there is no evidence that the micromanagement was motivated by Johnson's December 2021 EEO Complaint. Johnson complained about much of the same micromanaging prior to filing to that complaint, and he has not suggested that the micromanaging intensified or accelerated in

---

[11] *See, e.g.*, PSOF ¶ 27 (alleging numerous instances of alleged retaliation by McField; Opp'n [52] at 12–13 (suggesting McField's conduct contributed to Johnson's retaliatory constructive discharge).

response to his filing of that complaint.[12]  Likewise, to the extent that Johnson's limited involvement in the Ross-Clay allegations even qualify as protected activity, there is no evidence from which a jury could find that the micromanagement was the product of retaliation on the art of McField.

Nor is there any evidence that the sexual harassment investigation was commenced for retaliatory purposes.  Uncontroverted evidence shows that it was Christopher Wirtjes in the PAS office—not McField, Coleman, or anyone else in the police department—who opened the investigation.  (DSOF ¶ 35 (undisputed).)  Johnson speculates that McField convinced Ms. Stubblefield—a VA worker who evidently is stationed at a different facility—to falsely accuse him of harassment, but there is no evidence at all in support of this theory.  Summary judgment is warranted.

## II.    Constructive Discharge

Johnson also alleges that he was constructively discharged in August 2022.  The court notes at the onset that he does not appear to have raised this claim before the VA; it was not mentioned in the December 2021 or April 2022 EEO Complaints, and Johnson never amended either complaint to allege constructive discharge.  Because "a federal employee must exhaust his administrative remedies" before filing suit, *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099 (7th Cir. 2013), a constructive discharge claim not raised before the agency cannot be raised in federal court.  *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 n.2 (7th Cir. 2004).  Perhaps sensing this problem, Johnson's Opposition characterizes this claim as "*retaliatory* constructive discharge."  (Opp'n [52] at 12 (emphasis added).)  This complicates matters because a plaintiff can allege retaliation for filing an EEO charge without filing a second complaint.  *See Luevano v.*

---

[12]    Many of these claims appear to have arisen shortly after Armstrong and Johnson were promoted around August 2020.  Any mistreatment that occurred around that time would be barred, as Johnson's settlement agreement with the VA released all claims that arose prior to June 25, 2021.  (DSOF ¶ 8; *see also* Pl. Resp. to DSOF ¶ 8.)

*Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1030 (7th Cir. 2013) ("We have held for practical reasons, to avoid futile procedural technicalities and endless loops of charge/retaliation/charge/retaliation, etc., that a plaintiff who alleges retaliation for having filed a charge with the EEOC need not file a second EEOC charge to sue for that retaliation."). The VA questions whether that principle applies here (Reply [56] at 7–8), but because the court ultimately finds that summary judgment is warranted for other reasons, it will assume, for purposes of this ruling, that the retaliatory constructive discharge claim is properly exhausted.

"An employee is constructively discharged when, from the standpoint of a reasonable employee, the working conditions become unbearable." *Kedas v. Illinois Dep't of Transp.*, 149 F.4th 951, 957 (7th Cir. 2025). Constructive discharge can be shown in two ways. The first type occurs whenever "an employer acts in a manner that would make clear to a reasonable employee that she will be immediately fired if she does not resign." *Fields v. Bd. of Ed. of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019). This theory is appropriate, in other words, when the employer's actions demonstrate that "the handwriting was on the wall and the axe was about to fall." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (quoting *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)). The second type "occurs when a plaintiff resigns due to discriminatory 'working conditions even more egregious than that required for a hostile work environment claim.'" *Fields*, 928 F.3d at 625 (quoting *Wright v. Ill. Dep't of Child. and Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015)).

Johnson has evidence of neither. First, there is no evidence that Johnson was about to be fired. Johnson claims that his "withering barrage of negative treatment"—the failure to promote, unwarranted investigations, threats of discipline, and the harassment investigation— sent "a clear signal that the Agency intended to terminate him." (Opp'n [52] at 13.) The court disagrees; a constructive discharge cannot be shown simply because "a prospect of discharge lurks in the background." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citation and quotations omitted). Johnson attempts to support this claim by asserting that two

other officers—Paoli and Roshaun Hughey—were terminated or disciplined for retaliatory reasons, but at least at the time Johnson retired, both Paoli and Hughey remained employed there. (PSOF ¶ 34 ("After Plaintiff retired, Paoli was targeted by management"); *id.* ¶ 35 ("Plaintiff is certain that the Agency is working to terminate Hughey as well.").)

Nor has Johnson presented evidence of conditions so severe, pervasive, or egregious enough to constitute constructive discharge under the second type. The Court of Appeals has characterized this as an extremely high bar—one that is even higher than the already high standard for hostile work environment claims. Johnson's treatment, while surely frustrating, does not clear it. *Compare Chapin*, 621 F.3d at 675 (suggesting that threats to an employee's physical safety support a finding of constructive discharge), *Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (valid constructive discharge claim where employer threatened employee with noose), *and Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191, 1198–99 (7th Cir. 1992) (employer pointed firearm at plaintiff's head), *with Fugate v. Dolgencorp, LLC*, 555 F. App'x 600, 605–06 (7th Cir. 2014) (insults, micromanagement, unfair performance reviews, and false investigations do not meet the high bar for constructive discharge); *Levenstein v. Salafsky*, 414 F. 3d 767 (7th Cir. 2005) (no constructive discharge for professor who was suspended pending a sexual harassment investigation, temporarily assigned off campus for almost a year, removed as department head, and given demeaning tasks).

Finally, the court notes that Johnson had filed a complaint about the conditions he now claims were so severe that they forced him out. But as described above, he declined to cooperate with an investigation of that complaint and instead resigned before it was completed. As courts have recognized, a constructive discharge claim fails when an employee quits before giving the employer a full chance to investigate his claims of harassment. *See Cooper-Schut v. Visteon Auto. Syst.,* 361 F.3d 421, 429 (7th Cir. 2004).

Summary judgment is granted on Count IV.

## III.    Age Discrimination

Finally, Johnson argues that Coleman's refusal to promote him to GS-10 constituted age-based discrimination.  (Opp'n [52] at 8–10.)  This claim is not exhausted.  While Johnson complained of age discrimination in the April 2022 EEO Complaint, he subsequently abandoned that complaint: he did not respond to numerous attempts by VA investigators to reach him during their investigation.  (Def. Ex. 31, Final Agency Decision [43-4] at 27 n.4; DSOF ¶¶ 66–68 (undisputed).)

Johnson acknowledges that he did not cooperate with the investigation, but counters that the VA was nonetheless on notice of this claim.  He points to a statement he gave to investigators on March 7, 2022 (during the VA's investigation into his prior December 2021 EEO Complaint) complaining about the GS-10 promotion.  (Opp'n [52] at 6–7; PSOF ¶ 5.)  But notice is only one part of exhaustion.  As the Seventh Circuit has observed, the exhaustion rule both gives "the employer some warning of the conduct about which the plaintiff is aggrieved, *and it affords the [parties] an opportunity to attempt conciliation without resort to the courts*."  *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1005–06 (7th Cir. 2019) (emphasis added) (quoting *Rush v. McDonald's Corp.*, 966 F.3d 1104, 1110 (7th Cir. 1992)).  Notice is not disputed here—the VA acknowledges that it was put on notice when Johnson filed the April 2022 EEO Complaint explicitly accusing Coleman of age discrimination.  (Reply [56] at 5.)  The problem is that Johnson abandoned this complaint after it was filed, denying the VA a chance to do anything about it.  Johnson's failure to cooperate with the investigation means that his age discrimination claim is not exhausted and not actionable here.[13]  *See Doe v. Oberweis Dairy*, 456 F.3d 704 (7th Cir. 2006) (noting that, if federal employees

---

[13]    Johnson suggests that the GS-10 denial claim is exhausted because it is "like or reasonably related to" allegations raised in his earlier December 2021 EEO Complaint.  (Opp'n [52] at 5 (quoting *Harper v. Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995).)  The court is skeptical: the GS-10 denial claim does not appear to be factually related to any of the allegations made in the December 2021 charge.  *See Chaidez v.*, 937 F.3d at 1005 ("The fact that the charge and complaint generally assert the same kind of discrimination is not sufficient, without some factual relationship between them.")  Regardless, Johnson's decision to report the GS-10 denial in a second EEO charge suggests that the matters were not related to one another, as Johnson

were not required to exhaust, they "would have an arbitrary choice of forums, and the courts would be burdened with litigation that could have been conducted, perhaps more expeditiously and expertly, before the administrative body").

## <u>CONCLUSION</u>

Defendant's motion for summary judgment [40] is granted in full. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff.

ENTER:

Date: February 17, 2026

_____
REBECCA R. PALLMEYER
United States District Judge

---

effectively recognized when he separately challenged the GS-10 promotion denial by way of the April 2021 charge.